John Cobb, junior, plaintiff in error, vs. The State of Georgia, defendant in error.

[1.] It was not error for the presiding Judge to advise the Sheriff to cause the Constables of the county to summon a large number of persons qualified to serve as jurors, living in remote parts of the county, to attend at the Court House on the day appointed for the trial, that tales jurors might be summoned with convenience.

[2.] It is not error for the Court to allow the testimony of witnesses taken down in writing to be read over to them in the presence of the jury, for the purpose of correcting errors which may have been committed, in writing it down.

[3.] A letter addressed to and read by or to a defendant on his trial, to which he makes a verbal reply, may be read in evidence to enable the jury to understand the reply, but not as evidence of itself.

Cobb vs. The State.

[4.] That a verbal reply to a written request made in a letter, was made in the Penitentiary to the principal keeper thereof, constitutes no objection in law to its admissibility in evidence against the party making it, if voluntarily made, and drawn out by the exercise of no improper influence.

[5.] When a defendant, who is jointly indicted with another for murder, who has pleaded guilty to the charge, is appealed to by that other, who must know his guilt, if guilty, to confess the crime, and he simply refuses to confess, but does not deny his guilt, the circumstances may be given in evidence to the jury.

[6.] The Supreme Court will not control the presiding Judge in the Court below, who heard the evidence and tried the cause, in deciding how far the remarks of counsel are warranted by the evidence before the jury, when it is not clear that they were unwarranted.

[7.] Witness may answer whether an instrument which he has heard described, but has never before seen, answers the description given, or is the same instrument, and if he make an improbable statement, it may be made the subject of comment before the jury.

[8.] No error in the charge of the Court to the jury that one positive witness, is to be believed, rather than many negative witnesses to the same point. It does not differ from the legal principle, that the existence of a fact testified to by one positive witness is rather to be believed, than that such fact did not exist, because many witnesses who had the same opportunity of observation swear that they did not see or know of its having transpired.

Murder, in Fulton Superior Court. Tried before Judge BULL, at October Term, 1858.

The following is the bill of exceptions, upon which this case was heard, and which with the opinion delivered by the Court, contains all the facts necessary to a full understanding of the points adjudicated.

GEORGIA, Fulton County:

*Be it remembered*, That during the October Term, eighteen hundred and fifty-eight, of the Superior Court of said county, his Honor, ORVILLE A. BULL, Judge of said Court presiding, the case of the State of Georgia vs. John Cobb, jr., being an indictment for murder, was called, and with consent of parties, set down for trial on a given future day in said term; after which his Honor, the presiding Judge, advised the Sheriff to cause the different constables of the

county to summon a large number of persons, qualified to
serve as jurors, living outside of the city of Atlanta, and in
remote parts of the county, and have them at the court-house
on the day appointed, in order that a jury might be had, which
the Court thought otherwise impossible.   This suggestion
was given to the Sheriff, and notice of it was not communi-
cated by the presiding Judge to the defendant, or his coun-
sel, in time to enable them to urge it as a cause of challenge,
because the Court had no doubt, and has none now, that the
counsel knew it at the time the jury were empanneled.
When the day of trial arrived, many of the persons so sum-
moned by the constables, being in attendance under the
above named order, were put upon the defendant as tales
jurors, though not until after having been selected as such from
among the by-standers, by the Sheriff, under the usual order
from the Court, given at the time, directing him to take
whom he pleased from the by-standers at large : and the
panel was made up from the by-standers at large.   To this
mode of bringing in, summoning and selecting said tales
jurors, and to the first above mentioned order and instruc-
tions of the Judge to the Sheriff, and through him to the
Constables, the defendant excepts and assigns the same for
error.   No objection being intimated at the time of empan-
neling the jury, and no evidence offered afterwards that the
defendant and his counsel did not know a fact so notorious.

From said tales jurors and others, and from the regular
panels, a jury was impanneled and sworn to try the prison-
er, when the following evidence was introduced, under the
circumstances, and objections hereinafter detailed, to-wit:

The State first introduced *James Hill,* who being duly
sworn, testified as follows : He was coming up the McDon-
ough road about three miles from the Court-house, Mr.
Little and Mr. Gammon hailed to witness and said, there
was a man in a bad fix : witness got out of his wagon, went
down to the body of the man ; tried to get him to speak but he
could not; made an effort to do so ; left him ; then came on

back to the road, making search if they could find any wea-
pons. In doing so, saw where he had been dragged over
leaves and bushes and a couple of poles ; got to the edge of
the road, a little boy was with them. The boy was looking
about, saw a leather string ; caught hold of it ; pulled it up out
of the leaves ; a slung-shot was fastened to it. Witness took
hold of the ball and looked at it; handed it to some other
person. Told Mr. Little and Mr. Gammon to remain there ;
W. came on to town after the coroner and physician. This
was on the 8th day of April, 1858, in the county of Fulton ;
the body was 30 steps from the slung-shot and near the track
where the body was dragged ; did not examine the slung-
shot very particularly ; thinks he would know it if he were
to see it ; the one exhibited in Court is the one found there
on that day. The condition of the deceased was very bloody;
his mouth was full of blood ; his head was very bloody ;
saw a vehicle thereabouts next day on the opposite side of
the road—one horse—no animal to it. It had formerly had
a top to it, which was sawn off; did not know the deceased ;
his age was about sixty years ; had on home-made, woolen
clothes; the deceased lived from Thursday evening until
Monday morning; it was between four and six o'clock; W.
went to the place where deceased was ; the vehicle was a
carry-all and about a hundred yards distant from the road.
This was on the McDonough road, you go out McDonough
street to get in said road. Mr. Little's brick-yard is on the
right hand side of the road ; it is on a direct route to the
place where deceased was found. The brick-yard is about a
mile from town. This brick-yard is two and a half miles
from the place where deceased was found. Geo. W. Mobb's
house is on the road you go from Atlanta to the scene of the
killing. His house is about a mile from the place where de-
ceased was found.

The State next introduced *Josiah Gammon*, who being
duly sworn, testified as follows : Witness and his wife were
in town; started home, and as they went on saw Mr. Little ;

he and a negro man about starting down the road; W. and wife stopped a while and went on with them; got down to witness's house. Hutchins, Little and W. went on down the road to where deceased was; when they got there he was lying on his side rather; saw Mr. Hill and his wife coming up the road; said to him there was a man in a bad fix. Mr. Casey and family came up; they were looking around; Mr. Casey's little boy picked up a slung-shot; said, what is this? The parties present concluded to send Mr. Hill on to town after the coroner and doctor; soon after he left, several came up. Mr. Garrison sent to the house, got some rags and water and washed the dry blood out of deceased's mouth. He was moved to the house of Mr. Aaron Garrison. It was on the 8th day of April, 1858, on Thursday evening; thinks the sun was about one and a half hours high; it was in the county of Fulton. The slung-shot was found about twenty-five or thirty steps from the body of deceased; thinks he would know the slung-shot if he were to see it; thinks the one exhibited in Court is the same one found near the body of deceased. It was about twenty-five or thirty steps from the road where they found deceased. The slung-shot was found near the road-side and near the place where it was found, was some blood found on the leaves; knows where the brick-yard is, near Mr. Little's. There is a house between the brick-yard and Mr. Little's; some one was living in it at the time. These points are all on the McDonough road; you go out McDonough street to get into said road in going out from town.

*Cross-Examined.*—It may be nearly one-fourth of a mile from where W. and Little left the negro, to where deceased was found. It was woods all the way down from the road to where they found deceased; did not see the negro after leaving him until nearly dark. From the time the negro left witness until Hutchins told him of the condition of deceased, was about thirty minutes; the negro was going in the direction where the body was found; it was a negro man; thinks

it was about two miles from the brick-yard to where the body was found. W. thinks widow Cole lived in the house between the brick-yard and Mobb's; thinks it was about a mile from Mobb's to where the body was found. The negro was on his way for wood at the time W. left him.

The State next introduced *Lawrence Hutchins,* who, being duly sworn, testified as follows: Joseph Gammon, Mr. Little and W. were together when they found the body. Mr. Little's black man first told W. about the body. Mr. Little, Gammon and W. went to the place where the body was; the body was about twenty-five or thirty steps from the road; was not acquainted with him; he was badly hurt; did not see any carriage about there that day or the next; saw a slung-shot; was not there when it was found.

*Cross-Examined.*—Witness was about a half mile from where the body was found.

The State next introduced *Dr. Willis F. Westmoreland,* who, being duly sworn, testified as follows: He was the physician who attended Mr. Landrum; saw him first in the road near where he was murdered; saw him next at Mr. Garrison's; saw many wounds upon him; had several wounds upon the head, some eight or ten; his skull was fractured; broken probably into twenty pieces; he was able to speak when W. saw him, but was not rational; he lived from Thursday evening until Monday morning after. Blows upon the head caused his death. He died at Mr. Garrison's, in this county; was first called to him on Thursday, somewhere about 1st of April, 1858; sometimes he would speak and give his right name and then some other. He was not rational; was not acquainted with him before. The wounds were inflicted with a blunt instrument; one of the wounds seemed to be bruised; inflicted with an instrument, bruising with contusion around it; the other was lacerated—torn. (The slung-shot was here presented.) Thinks it would cause such wounds; a number of the wounds must have been inflicted with a round instrument, breaking the skin only in

one place in the center and contusion immediately around; saw the deceased's coat; it was a short coat with pockets in the side; thinks it was a sack made of yellow or brown jeans; no other garments W. can describe. W. got to the wounded man after dark; the blood was dry on his clothing; thinks it would require several hours to dry as it was.

*Cross-Examined.*—Thinks he left town about deep dusk to go out; the deceased gave his name several times Samuel Landrum; could not say from the condition the deceased was in when he saw him, when he was wounded.

The State next introduced *Silas B. Kent,* who being duly sworn, testified as follows: He is acquainted with John Cobb, jr.; Witness was working at Mr. Williams's brickyard 1st of April, 1858. It is outside of the incorporation on McDonough road; was working there the time Mr. Landrum was killed; heard of his death the day after it happened. The day the killing took place witness was working at the same place; saw on the day of the killing the gentleman that got killed pass in a little carry-all and then saw Mr. Jones, Mr. Cobb and another man pass; did not know the other man at the time; has since found out it was Mr. Crockett. The vehicle in which the old man was riding had one mule to it; it did not have any top; did not notice it particularly; did not notice the man in it much; saw them all when they crossed the branch; the man in the buggy was ahead; Cobb and Jones and the other man were not right up with the old man—close behind; this was between ten and eleven o'clock. W. has known Cobb and Jones about five years; did not know Crockett at the time; saw him several times since, here in jail and when he was executed; W. is positive Cobb and Jones were following the old man in the carry-all at the time mentioned. When W. alludes to John Cobb, he means young John Cobb. (Witness here pointed out the defendant in the court-house.) They were going down McDonough road when W. saw them; saw them about two hundred yards before they got out of sight. When W. last saw them

they were going down McDonough road.    Two of the Mr.
Helton's, Mr. Cox, Mr. Archibald Brown and Mr. Williams
were at the brickyard the time W. was at work there; says
he sees Mr. Jones in the court-house—points him out.    When
W. last saw Cobb and Jones and this other man, they were
still together.

*Cross Examined.*—Says he is eighteen years of age: it was
about fifty yards from McDonough road to where they were
at work ; was doing regular work when parties passed—pitch-
ing brick ; does not remember any other persons that passed
the day of the killing; recollects seeing some ladies pass—
the Misses Robinson ; Mr. Brown said he thought he knew
the old man in the carry-all ; never noticed particular the
third person with Jones and Cobb ; thought Cockett was the
man from his looks afterwards ; if W. had seen them all
three together, he thinks he would have known Crockett ;
saw them all three together in the court-house last Court ; does
not know how many days it was after Cobb, Jones and this oth-
er man passed the brick-yard before he heard of the murder ;
does not recollect to have seen them pass at any other time
than the one he mentions ; thinks it was in March he saw
them pass—about the last of March ; it was not a common
buggy—*sorter* of wagon.    The parties, Jones and Cobb,
were about 25 or 30 yards behind the wagon.    Nothing hap-
pened to fix it upon witness' mind that it was ten or eleven
o'clock when they passed.

*Re-examined by the State.*—When the men passed, there
was something said about knowing them—that called his at-
tention ; knows it was before dinner they passed ; about an
hour or an hour and a half; does not know when he heard
of the killing; thinks it was on Wednesday ; does not know
the day of the month or week ; does not think the Superior
Court was sitting at the time he saw them pass ; thinks he heard
of the killing about the middle of this year; it was the day
after he saw them pass the brick-yard he heard of the kill-
ing ; heard of the killing the day after it happened ; never saw

Cobb and Jones and Crockett pass at any other time than the one he testifies to; heard of it the next day after he was found; heard of it from some young men who went from brick-yark to see him; does not know how long it was after Jones and Cobb passed; don't know who told him; don't know what time of day it was; some person had stopped at the brick-yard and told them of it—before the hands went to see him.

The State next introduced *John H. Helton*, who being duly sworn, testified as follows: He was working the early part of this year on McDonough road, making brick at Mr. Williams' brick-yard; saw Gabriel Jones and John Cobb pass by said yard; young Kent was working there; one of the boys saw them passing, spoke of it and called W's attention to them. Saw three women pass the same day. If he saw a man pass in a vehicle does not recollect it; thinks it was the 8th of April, 1858. This all took place somewhere between 8 and 11 o'clock, A. M.; did not see Cobb and Jones come back by brick-yard. Witness worked there a little over a month; saw Cobb and Jones out at the brick-yard once before; stayed there a while and came back to town; saw Jones and Cobb pass out on the 8th day of April, 1858: saw the body of deceased on the 9th of April.

*Cross-Examined.*—He was summoned to go before the Coroner's jury on the 11th or 12th of April, 1858; that was the time he first commenced thinking it was the 8th of April, 1858, Cobb and Jones passed; thinks he is positive it was the 8th of April, 1858; he recollected back when he was called before the coroner, and that makes him remember the date. Mr. Kent was hauling brick in a wheel-barrow; when he would go after a load he would be about 20 yards from witness; were all busy at work in brick-yard; Hamilton Davis, and two of the Cox's were at work in the yard; Mr. Williams might have been there in the morning; was not there when these men, Cobb and Jones passed; Archibald Brown was there; women were ahead of Cobb and Jones; about

ten minutes ahead; looked at Cobb and Jones; and did not see any person with them; W. just threw his eyes out, saw them; was busy at work; a wagon might have passed in fifty yards of these men and W. not see it, as he was busy at work. The time Cobb and Jones came out to the brick-yard before, they stayed two or three hours. Witness was kilning brick at the time of the passing on the 8th day of April, 1858. Witness was sitting on kiln, catching brick; the boys bringing brick to him had a better chance to see any one passing than W.; W's mind was first called to the fact of Cobb and Jones passing the next day after the murder; thinks it was on Thursday they passed. When W. saw Jones and Cobb pass he just threw his eyes upon them and took them off again.

The State next introduced *James B. Lofton*, who, being duly sworn, testified as follows: He had a slight acquaintance with Samuel Landrum; saw him on the morning before he was said to be killed; he had on an old white hat, inclined to be smoked; inquired the way to Mr. Almond's—Mr. Asmos Almond's; did not notice his coat particularly; thinks it was a striped, greenish color—is not positive what the color was; did not see his vehicle; told W. he had a buggy; thinks the time he saw him in town was between 10 and eleven o'clock; thinks Landrum was about 60 or 65 years of age; saw him when he was dying, and was the same man who told W. in town his name was Samuel Landrum. You take the McDonough road and go it about six miles to turn to the right to go to Almond's. There is a brick-yard on the way; Mr. Little also lives on the way; Gammon also lives on the route to Almond's; pass Mr. Little's first, then cross a creek; the brick-yard is next; next house is Mr. Mobb's; next place is Mr. Gammon's house. Does not think there is any other house between that and the scene of the murder; thinks it is between half a mile and a mile from Mobb's house to the scene of murder; did not see the deceased start out of town.

*Cross-Examined.*—Witness had never seen deceased before the day he was killed; thinks he might have been with him an hour, or less than an hour; thinks the pockets in his coat were in the side.

The State next introduced *A. R. Almond,* who, being duly sworn testified as follows: He is acquainted with Samuel B. Landrum; knew him in Alabama. The last time he saw him was at the house of Aaron Garrison; he was awfully mangled; died at his house in Fulton county; it was three and a fourth miles to where he was killed from the court-house; he knew the deceased well; had dealings with him. It was the early part of April, 1858, he saw him at the house of Aaron Garrison; he had on a dingy, white hat—was fur; thinks he was fifty or sixty years of age; nearer sixty than fifty; saw his coat; has seen it on the deceased in Alabama; it was a dark grey; did not notice where the pockets were; did not see him in town before he started out.

The State next introduced *Stephen Cox,* who, being duly sworn, testified as follows: Was working at the brick-yard of Mr. Williams' on McDonough road in the early part of April last; saw Mr. Cobb pass there when he was at work there; does not know Cobb and Jones; remembers the time Mr. Landrum was killed, that is, remembers hearing of it; heard of it about the 10th day of April last; saw three young men and an old man pass the brick-yard on the 8th day of April; it was after dinner time; never saw Crockett to know him. The four men he saw pass were going towards the mill on the McDonough road; saw a carry-all among them; had two seats in it; had one mule hitched to it; had no top to it. There was one man in it, an old looking man; had on a high white hat; brim was mashed down; the other three men were walking along side of the wagon; saw them when they crossed the branch; stopped at the branch until the mule drank; saw a man take down the bridle reins until the mule drank; saw three women pass about half an hour be-

Cobb vs. The State.

fore these men went on; did not see the women come back.

*Cross-Examined.*—Witness worked at the brick-yard all last summer; had worked there about a month before he saw these men pass; had never seen the men he saw pass before in his life; had never seen Cobb and Jones before he saw them pass on the 8th of April, if it were them. Two young men came there sometime before and stayed about half an hour; was there every day Mr. Helton was there; has never seen the two young men, that stayed at the brick-yard about half an hour, since; does not recollect of any other two young men coming to the brick-yard while he and Helton were there; does not know it was the 8th of April he saw them pass; does not know the day of the week; it was about two o'clock he saw them pass. Mr. Helton, Mr. Brown, witness, Mr. Kent and a brother of W. were there; W. was rolling brick to the kiln; was about ten yards from the road. Kent was at the same business as W.; Kent pitched up some of the brick, and W. some; Kent was pitching when they passed. W. and Kent were near the same place. The young men were walking side of the wagon when W. first saw them; they were on this side of the brick-yard about one hundred yards; all came on down the hill together; the boys were talking to the man in the carriage; W. did not stop work; saw them all the way down to the creek; creek is this side of brick-yard. The young men crossed the creek on a foot-log; the old man crossed in his carriage. Mr. Helton said it was Mr. Crockett that let down the bridle for the mule to drink; told him so the day they passed; it was John Helton—and W. is not mistaken about this. Has not read Crockett's confession—heard no person read it. After they crossed the branch, the young men still walked by the side of the wagon; saw them about one hundred and fifty yards from the branch to where they went out of sight; was at work all the time; saw them all the time, from the time they came in sight until they went out; they were not up with the

carriage when he first saw them; they were not as much as five or six steps behind the carriage—he is certain of this. The young men walked on the same side of the carriage as far as W. could see them; went after brick while these people were passing; went more than once. In going after brick, he went from the public road. W. is perfectly certain he had eaten dinner when they all passed; is certain he is not mistaken about this mattter; finds it is easy to be mistaken about things of this sort; is certain the women passed after dinner. Mr. Williams was in the habit of going to the brick yard every morning. The men passed the brick-yard on Thursday, and witness heard of the killing on Saturday. Does not know how long after the murder occurred until he heard it. Swore a while ago that he did not know what day of the week these men passed; it just comes to his mind now the reason he now knows; heard Mr. Little's negro man tell the boys at the brick-yard the next day after the killing, about a man being killed. It was on Saturday the negro told about it at the brick-yard; there was nothing said about it the next day after the killing; all hands worked at the brick-yard the next day after the killing. He is positive as to the above statements.

The State next introduced *Robert Helton*, who, being duly sworn, testified as follows: He was working in the brick-yard of Mr. Williams the early part of April last; heard of the killing about that time; was working in the brick-yard at the time; thinks he heard of the killing the next evening after it was done. The day on which it happened, saw three men and three women pass the yard; saw an old man, with a white hat on, pass in a carriage; had a mule to it; had no top to it; the man in the carriage looked like an old man; the three men were one hundred and fifty yards behind the carriage; they were behind the carriage going out from town; saw them first after they passed the brick kiln. After they crossed the creek they were about fifty yards or more from witness, when he first saw them; did not know

Cobb vs. The State.

them; it was next evening he heard of the murder; can see a right smart piece each way from the brick-yard; hill on each side; you can see them farthest going from town. It was about 10 or 11 o'clock when they passed; it was before dinner; has not seen the three men since to know them; two Heltons, two Coxes, Hamilton, Kent and Davis saw them just as they passed the brick-yard; thinks the three men were about fifty yards from the man in the wagon, when witness saw them; the women were between the men and the wagon when witness saw them; the old man had on a white hat.

*Cross-Examined.*—Witness had been working at the brick-yard a month or so before he saw them pass; his employment on the day was first one thing and then another; was rolling a wheelbarrow at the time they passed; witness, Cox and Kent were at the same work when they passed; was positive it was before dinner they passed. When witness first saw the wagon, it was past the brick kiln; the women were between the men and the wagon; the women were about thirty yards behind the wagon—the men about fifty yards; the creek is not fifty yards from the brick-yard; the creek is on this side of the brick-yard; there is no creek or branch in sight after they pass the brick-yard; thinks the wagon could go a quarter of a mile beyond the brick-yard before it got plumb out of sight; the boys were all busy at work; thinks he heard of the murder the same time John Helton heard it; thinks he was at the brick-yard when he heard of the killing; it had rained, he thinks, after the young men passed, before he heard of the murder; he was sometimes absent from the yard; did not know the women who passed; it is a public road—the McDonough road. ·

The State next introduced *McDonald Davis*, who, being duly sworn, testified as follows: Witness was working in Mr. Williams' brick-yard in early part of April last; was bearing off brick; heard of some one being killed out there about that time. Thinks heard of it on Monday after it hap-

pened; thinks it was four or five days before he heard of the killing; is acquainted with Cobb and Jones; has known them about four years; does not know Crockett; Jones and another man who they said was Crocket, came to the brick-yard about a week before; saw Jones and Cobb going out the McDonough road, and another man who looked just like the man they said was Crockett; this was on Wednesday or Thursday. Witness thinks they passed between eleven and twelve o'clock; does not remember seeing any one pass in a carriage; saw, about fifteen minutes before Cobb and Jones passed, three women pass; does not know them; it was before witness saw them pass that he saw Jones and a man they called Crockett, about a week before, when he saw them at the brick-yard; saw the three men along the road some two or three hundred yards; did not see them until they crossed the branch; there is a hill the other side of the brick-yard; saw them to the top of it; the women were ahead of the three men; thinks it was Wednesday or Thursday; heard of the murder the first of the next week; thinks it was Monday; saw Crockett when he was hung; saw him well; thinks he was the same man he saw with Jones at the brick-yard.

*Cross-Examined.*—Had been at work at the brick-yard as much as two weeks; Jones was at the brick-yard only once, and then a man was with him who they said was Crockett; when they passed, he knew the man with Cobb and Jones was the same man he saw out there with Jones; was with them. If Jones had been at the brick-yard more than once, witness had not seen him, and he worked there all the time. Bud Hamilton, Benjamin Bowen and witness were bearing brick; witness was about 20 or 30 steps from McDonough road; the women had gone out of sight before the men came along; had been gone ten or fifteen minutes; thinks it is about two or three hundred yards from brick-yard to where they went out of sight; did not see any wagon or carriage pass about that time; all the hands stop-

ped and looked at them when they were passing; there were three women; did not see the women come back; went on at work there; worked every day the next week that any one could work; first heard of murder at home, then at the brick-yard; when witness heard of it deceased was not dead.

The State next introduced *Mrs. Elizabeth Brown*, who, being duly sworn, testified as follows: Heard of a man being killed on McDonough road last Spring; remembers seeing a middle aged man pass in a wagon, a mule hitched to it; was very ordinarily dressed; had on an old white fur hat; looked as though he was between forty-five and fifty years of age; he inquired the way of witness to Mr. Almond's; this was on Thursday; does not know the day of the month; heard of his being killed, the next day; witness's house is on McDonough street, just out of the incorporation; witness's house is between a half and three-quarters of a mile from Williams's brick-yard; it was not far from 11 or 12 o'clock when she saw him pass; he had on a sort of a brown jeans coat; the old man went on the McDonough road.

The State next introduced *J. P. Knight*, who being duly sworn, testified as follows: Heard of a man being killed last Spring; does not know the day of the month; it was the first of April last; thinks he heard of it on Saturday first after the killing; saw a man on Thursday passing out in a vehicle; thinks it was somewhere about 11 or 12 o'clock; he was going to Mr. Almond's, deceased said; his wagon was a four-wheeled concern; it was what you might call a carry-all, with the top off; it was drawn by a mule; witness thinks by a sorrel mule; he had on an old white hat—saw him on McDonough street; he was an old man, about 40 or 50 years of age; saw the man who was killed; was the same man; it was right at Arche Brown's door witness saw the old man when he was going out.

The State next introduced *George W. Mobbs*, who, being duly sworn, testified as follows: He heard of a man being killed the 8th day of April last; saw the man; was at home

in the first part of the day; saw three men coming by; one had a gun; fired it off; went to work in the blacksmith shop about 11 o'clock; was watching out for Mr. Meredith Brown; heard a carriage passing or coming from out of town; stepped to the door to see if it was Brown; saw a gentleman passing in a kind of Jersey concern; saw it was a single man riding in it; went back to work and heard another coming; went to the door again; carriage passing; two men in it; they passed by; the mule in a trot; turned back to the fire place and discovered two men against a pile of lumber near witness's house, all going down towards McDonough; when witness saw the two men, thought one was Meredith Brown; he was stoop shouldered sorter; there was a man with him near a head taller than he was, and a good deal larger. This was about half past eleven o'clock, just before dinner; my house is something near a mile from Williams's brick-yard, on the other side from town; the first carriage passed had only one person in it; it was about 15 or 20 minutes from the passage of the first carriage to the second carriage; there were two persons in the second; it was a Jersey concern, and had no top; had one mule to each wagon passed; it was long enough for a man to walk 15 or 20 steps from the time he saw the second carriage pass until he saw the two men on foot pass; three women came by between the first and second wagon—inquired the way to Benjamin Thurmond's; they were the Miss Robersons; the women had passed about long enough to walk a hundred and fifty or two hundred yards; did not notice the tallest man's clothes; dressed in dark clothing. If he ever saw Crockett it was on that day; he noticed, as he passed, his head pitched forward and his shoulders seemed to be higher than usual; can't say whether he believes it was Crockett; the make of the shoulders and the head pitching forward, is all that makes him think it was Crockett he saw that day; knows where the body of Landrum, the deceased was found; it was three-

fourths of a mile from witness's house on the road to Almond's.

*Cross-Examined.*—It was 25 or 30 minutes from the time the first three young men passed until the first carriage passed; one of the carriages was a blue one and the other a black one; the blue one was ahead; there was a plain fork in the road, leading to Rough and Ready, the other side of witness's house; soon after he saw the second carriage pass, he saw two gentlemen pass; one was Mr. Ed. Webb; he lives here in town; saw the carriage found near the deceased; it was a carriage fixed for carrying four persons; had no top; it was pretty well worn; the harness were worn; fixed to work one mule to it; color of it black; thinks it had had posts, but had been sawn off; would call it a carriage, a kind of Jersey concern; it was like the one witness saw pass his house last; witness is positive there was a difference in color; the reason why he knows the blue carriage passed first, is because Meredith Brown's carriage was black, and he noticed the first one passed was blue.

The State next introduced *Samuel P. Wells*, who, being duly sworn, testified as follows: Heard of a man being killed on McDonough road; heard of it in a day or two after it was done; was out hunting on the 8th of April last; Mr. Landes and Mr. Crawley were with him; they passed Mr. Mobb's house, one of the party fired off a gun near Mr. Mobb's house; this was about 9 or 10 o'clock; went out to fish and carried a gun to kill birds for bait; turned off from the McDonough road at Mobb's house round his stables; this was on the 8th day of April last.

*Cross-Examined.*—Passed Williams's brick-yard and talked with the hands and then went on.

The State next introduced *Mrs. Salina Bolin*, who, being duly sworn, testified as follows: Heard of the death of Mr. Landrum about the time he was killed; saw Jones and Cobb next morning after she heard of the murder; thinks it was Friday morning; does not know the day of the month; they

were coming from towards the grave-yard, going towards the railroad. Witness knew Mr. Jones and Mr. Crockett; this was between 9 and 10 o'clock, A. M.; did not speak to them; came close to W's house; W's house is near the water station; passed outside of W's yard; did not see any signs of traveling; it was in the month of April last; about the first of the month.

The State next introduced *James W. Clay*, who, being duly sworn, testified as follows: About the time deceased was killed, saw Cobb, Jones and Crockett near his house; the house is about three and a half miles from Atlanta, in direction of Decatur, off to the right of the public road three-fourths of a mile. When witness went up, Cobb and Jones were sitting on a log; Crockett was squatted down with a valise, tying up clothes in a handkerchief; witness and Crockett went down to witness's house; Crockett asked Cobb and Jones to go with them; they refused; Crockett went down and took dinner; Crockett carried Jones's and Cobb's dinner to them; witness went with Crockett; as they went up to them after they ate dinner up in the woods, W. took the plates and went back to the house; they all three went on with W. towards the house, in about 70 yards of the house; they all turned off the fence side and went towards Decatur; that is the last W. saw of them; they had two bundles of clothes in their pocket handkerchiefs; Crockett had one and Cobb one; W. carried the valise to the house; W. is a relation of Crockett; a second cousin; thinks this was on Friday; thinks it was in April last, the ninth of that month. No public road runs by W's father's house; it was about three-fourths of a mile from Decatur road 'where he saw Cobb, Jones and Crockett; they were on the side of the settlement road; this was some time between 10 or 11 o'clock, A. M.

*Cross-Examined* — They went out after dinner and struck another road; went through a neck of woods.

The State next introduced *John S. Shipley* who, being du-

ly sworn, testified as follows: On Friday morning after the murder, saw some men coming down the road; is not acquainted with Crockett, Cobb and Jones; knew one of them was Crockett; two other men with him; just below the rolling mill they left the Decatur road or railroad.   Thinks the the murder was committed on Thursday; was in April last; thinks about the 8th of April the murder was committed: thinks he saw those men on the 9th; knows it was Friday morning.   The other two men with Crockett he thinks were young looking men.   The rolling mill is on the Georgia Railroad and on Decatur wagon road; does not think he saw them more than ten steps; one of them had a valise; thinks this one was Crockett; does not think there was any road where they turned off; it was about ten o'clock when W. saw them; knows by the train passing; they were traveling the railroad; turn to the right hand going; Decatur is on the left side of the railroad from Atlanta.

*Cross-Examined.*—Thinks Cobb and Jones were with Crockett; cannot say positively that it was them.   It has always been on his, W's mind it was the 8th day of April ever since he first heard it; had heard of the murder at the time he saw them going from Atlanta; had heard it talked of by the people that they were the guilty parties.   They got off on the right side of the railroad; the public road is on the left where they got off.

The State next introduced *John D. Williams,* who, being duly sworn, testified as follows: Heard of the killing on Mc-Donough road; was at work down below the Rolling Mill; thinks it was the same day he heard of the murder he saw two men on the railroad and one the wagon road.   They met, passed down beyond the Rolling Mill and took the woods; went off on the right side of the railroad, going from Atlanta; in the woods—no road; thinks they had a valise; thought it was Cobb, Jones and Crockett at the time he saw; is not acquainted with them; knows them when he sees them; was about one hundred and fifty yards from them on

the morning referred to ; the public road is on left side of rail-road ; the railroad does not cross it under a mile from there ; thinks it was in April : it was the day W. heard of the murder ; was about ten o'clock ; Mr. Shipley was with W. when he saw them ; the witness who just testified.   They traveled the railroad about fifty or one hundred yards after they all got together.

*Cross-Examined.*—They were about the water station when W. first saw them ; W. and Mr. Shipley were right together, and did not separate while they saw them ; there is a crossing where they got off; goes into the woods and stops. The man with the valise came up with the other two at the Rolling Mill ; got on the railroad.

The State next introduced *Coleman Ford,* who, being duly sworn, testified as follows : Heard of the killing about the time specified and testified ; saw Cobb, Jones and Crockett on the 9th of April last, east of the city of Atlanta about two and a quarter miles on south side of the Georgia railroad ; were not on any public road ; it was about one and a half miles from Sam'l Clay's house ; that road intersects the road going by the grave-yard ; one of them had a valise ; is acquainted with Jones and Cobb ; was not with Crockett ; thinks it was between ten and eleven o'clock, A. M.

The State next introduced *John N. Pate,* who, being duly sworn, testified as follows : Remembers hearing of the killing ; saw Cobb, Jones and Crockett on the 9th day of April last ; saw them at the Decatur depot, between one and two o'clock ; thinks they had two handkerchiefs tied up ; clothes in them ; they passed down the railroad and then took the wagon road to Stone Mountain.   Is well acquainted with Mr. Crockett ; has seen Mr. Cobb several times ; did not know Jones at the time ; now recognizes Jones ; Williamson Cobb came up ; after he came, he, W. saw the parties ; Wm. Cobb and John are brothers ; Jones is a cousin ; came down railroad from Atlanta ; this was Friday evening.

*Cross-Examined.*—Saw them go into the wagon road to

Stone Mountain; noticed them particularly; passed the road some few steps; stopped, turned back and took the road.

The State next introduced *George W. Wheeler*, who, being duly sworn, testified as follows: Heard of the killing that took place last spring in this county; saw Jones and Cobb Sunday after it took place; does not know the day of the month; they were at Mr. Jones' brother's house in the county of Newton; this is about thirty-six or thirty-seven miles from Atlanta.

*Cross-Examined.*—Mr. Cobb said he was indicted in Fulton county and Court was in session and he did not want to appear. By forfeiting the bond he would only have to pay eight or nine dollars; said he was going to his grand-father's; would be back to Atlanta in three or four days; Jones said he expected to live with Mr. Dean; said he had been thinking of it for some time; had not got off; Dean lived four or five miles from where W. saw them; said they were so lonesome they wished they had come back Sunday morning; was coming back on Monday morning; W. was at the same place on Tuesday; they were gone; Cobb's grand-father lives near the corner of Clark county; Jones was going to work with Mr. Dean.

The State next introduced *William P. Sewell*, who, being duly sworn, testified as follows: He has seen the slung-shot exhibited in Court before; saw it last in this place last April; W. made it for a man by the name of Radford J. Crockett; made it some time in April last; don't know the day of the month; made it at Tomlinson & Barnes's copper shop, and delivered it to Crockett.

The State next introduced *Thomas Calloway*, who, being duly sworn, testified as follows: He was in jail soon after the killing testified to in Fulton county. Jones and Cobb asked witness if they could not turn State's evidence against Crockett; they were afraid Crockett would turn State's evidence against them; witness told them there was a way

to get out of it that way; Mr. Cobb said he would know the slung-shot if he were to see it; went on to describe it; said the string it was fastened to was a piece of soft leather, instead of gum elastic; there was a wire fixed in the sling-shot, to fasten the leather to; they described it as an eye on each side of it; did not say of what material it was made; said a man by the name of Sewell made it; Cobb said they left town with Crockett; went out and took dinner with a relation of Crockett's; they did not go in the house; Crockett brought them something to eat; they did so; went on then three miles below Decatur; Crockett went to his aunt's, Mrs. Richardson; Mr. Cobb said they were sorry they left town with Crockett—if they had not, they would not have been suspected; Mr. Jones said if ever he got out of this scrape, it would be the last; that he intended to live by his labor. This conversation took place the second evening after Jones and Cobb were confined in Fulton jail, and before it was known Crockett was arrested. Mr. Cobb said if Crockett turned State's evidence it would hang them; Mr. Jones said it would; says he would know the slung-shot from the description given; says the one exhibited in Court is the one.

*Cross-Examined.*—Mr. Cooper, Solicitor General, showed him the slung-shot last week; did not know Cobb and Jones personally before in jail; had seen them before; has been in and about Atlanta, for six or seven years; there were several in jail; Rice, Carter, and others; they must have heard the same; told his brother-in-law, Noel Inge, of what he had heard in jail; witness has a case in Court himself; charged with assault and batterry; was on bond and came to his case from South Carolina; talked with Mr. Cooper first, after he was subpœnaed; Cobb said he had seen the slung-shot, and would know it if he were to see it; witness never described the slung-shot before he saw it; the first time witness saw the slung-shot exhibited in Court, he recognized it as the one described by Cobb; witness examined very par-

ticularly when he first saw it, and his mind came to the con-
clusion it was the one described by Cobb in jail.

The State now tendered in evidence the above mentioned
slung-shot, but on objection from the prisoner, the Court re-
jected it as not being such an instrument of evidence as had
to be formally tendered and submitted to a jury, as in the
case of a deed or bond.

The State next introduced *R. W. Craven*, who, being du-
ly sworn, testified as follows: On the day the murder was
committed, he was out in the direction of the same; left
town about one o'clock; does not recollect the day of the
month or week; thinks it was on Thursday; not positive;
thinks he heard the murder was committed late the same
evening. He rode out, went on, after passing Mr. Mobbs's
a half mile or three quarters, saw a mule standing beside of
the road; passed by; went down and saw the man Perkins;
they went to see, and came on back; saw the mule as they
came on back near Mr. Gammon's; the mule had on the
forepart of the harness; the breeching was gone; the chains
were dragging the ground; the lines were dragging on the
ground; it was a pale bay or sorrel mule; where witness
first saw the mule was about three-fourths of a mile from
Mr. Mobbs's house. It was not attached to any vehicle when
witness first saw it; the time of day when witness first saw
the mule was about two o'clock; knows this because it was
about four o'clock when witness got back to Atlanta; heard
of the murder that evening after he came in town; it was
six miles to where witness went in the country; this was on
the McDonough road.

The State next introduced *Gen. Eli McConnell*, who, be-
ing duly sworn, testified as follows: Says he is principal
keeper of the Penitentiary; has been holding that office du-
ring the time that Cobb and Jones were confined in the Peni-
tentiary for safe keeping; (letter handed to witness,) says he
received it the latter part of May; when witness opened it
he found the body of it addressed to Cobb and Jones; when

he found the letter was addressed to these men with a note to witness he took the letter and went to the Penitentiary; read the letter first to Mr. Cobb; also read the note addressed to witness, on the letter; after he had read the letter to Cobb, witness stated to Cobb, you see now what this man Crockett has written to you and witness, observed he had no motive only for your good, and that witness having no motive himself only to give Cobb's answer to it; witness then asked him what he had to say in reply. His reply was that he should make no confession; thinks the exact words used by Cobb in reply were, I wont confess. (The letter was then read to the jury.)

The following is a copy of said letter:

ATLANTA, May the 27 1858.

Dear friends i now take this opportunity of dropping you a few lines to inform you that i am well at present—Gabe i would like to see you and John very much but i dont gess i will ever see you any mor as my time is close at hand to go but i hope i will meet you in a better world than this. Gabe i want you to send me word how you are a getting on and if you think god has forgave you yet al of your sins and whether you intend to try to meet me in heaven or no. Gabe i think if you will come out and make a full confession of the murder of Landrum and look to god for mercy you would be better satisfied if you dont you can never get to heaven i dont think Gabe if i could get out of Jail and be free by giving up my hope in the Lord and my chance for heaven, i would not do it if you had the love and fear of god in your heart i think you would not give it up for the sin ful world and all that is in it religion is worth a thousand such worlds as this religion is a fortune and heaven is a home yes and a happy one two the Lord ses seak me with your hoal hart and you shal find me pray with your hoal hart an you shal nevr die but heve eturnal life You think of the owful torements of hell you will then turn to god i think and try to seak a home in heaven Gabe you and John may think that i am

just a trying to get you to confess so that you will be hung but it is not so if it was in my power to turn you loos or clear you i would do it i no that you will both be hung there is no chance for you to escape it if you had staid here you would have ben hung without any trial i only want you to try to serve god and prepare for a better world while you have got the chance i think if you will study on it you will think that i am giving you good advice Gabe i would like to no that i would meet you and John in heaven

I remain yours until death

RADFORD J. CROCKETT.

To the principal Keeper, I received your letter and was glad to hear from the boys i was thankful to you for the information y gave me of them read this letter to them if you please and see if it wont have some offect on them and which it seems to take the most effect on and talk with them and tell them to answer my letter and write to me what they say or whether they seem to not wan to talk about it or no write to me how they are getting on you rote that Gabe was sick write how he is rite as soon as possible   I remain yours with respect          RADFORD J CROCKETT

*Cross-Examined.*—At the time Cobb made this reply witness was his keeper in the Penitentiary; unlocked the cell and went in to him; after reading the letter to Cobb, he kept it in his possession; does not know how it came here.

The State here closed.

The counsel for the defence then introduced *Jacob Carter,* who, being duly sworn, testified as follows: Was subpœnaed in this case to-day; was confined in Fulton county; was in about the spring Term of the Superior Court; was in jail when Cobb and Jones were put in jail; they were committed to jail on Tuesday evening about sun down; Powell Rice and Thomas Calloway were in jail with witness, before Jones and Cobb were put in; we three were together before they

were put in; Jones and Cobb were confined in the cage with us; did not hear anything said to Cobb or Jones or any conversation with any other person in reference to the murder of Landrum; did hear Calloway say to Jones and Cobb about Tuesday night of the same day they were put in; never heard but one conversation between them; we were all in the cage together; Powell Rice was lying down; don't know whether he heard it or not; the other four were sitting up; Thomas Calloway told Cobb to turn State's evidence against Crockett, and John Cobb told him he didn't know anything to turn State's evidence for; Calloway then asked Gabe Jones what he thought about it; Gabe Jones told him he did not know anything to turn State's evidence for; that is all witness knows; there was nothing said about a slung-shot or a sling-shot on that occasion or at any other that witness heard; there was nothing said about Jones and Cobb leaving Atlanta with Crockett; nothing said about their traveling together.

*Cross-Examined.*—Says he is about twenty-six years of age; does not know the day of the month or year he, witness, was put in jail; has got a good memory, and is perfectly positive that he did not hear any conversation between Calloway, Jones and Cobb; says he was put in jail on Monday; knows that Dink Carlton was not in jail when witness was in jail; thinks he knows this month is October; thinks last month was December; March, May, June, July, November, December and August; these are all the months witness knows of in a year and can name; Cobb and Jones were put in about a half an hour by sun on Tuesday evening, and is certain that the conversation Calloway had with Cobb and Jones, was on Tuesday evening; he cannot instance anything that impressed it on his memory that it was Tuesday the conversation; thinks it was about nine or ten o'clock the conversation took place; is positive it was dark and they had no light in the room; it was perfectly dark in the cage; had a little talk with Cobb and Jones; nothing

about the difficulty; had no conversation with Powell Rice; just talked backwards and forwards; witness did not talk any with Cobb and Jones on Wednesday; saw Wm. Cobb this morning at W's mother's house; was coming to town with him and met McDonald the constable; came on with him; is positive Calloway did not have any other conversation than the one he testifies to with Cobb and Jones; witness came in town about eleven o'clock; eat dinner at old man Cobb's; Wm. Cobb passed as his son; witness don't know the reason why he was turned out of jail; had sometimes one meal in jail and sometimes two; had but one meal on Monday; that was Monday night; eat two meals on Tuesday, and one on Wednesday; did not mention to any one what his testimony would be at any time; not a single soul until he went on the stand; no person has conversed with him to-day; or at any time before to-day in regard to his testimony, and he knows he is right; no lawyer or any other person.

Counsel for the defence next introduced *Mrs. Missouri Cobb*, who, being duly sworn, testified as follows: She is the mother of the prisoner; her son left on Friday the 9th of April last; prisoner was at home the day before at twelve o'clock on Thursday, dined at twelve o'clock; Savannah, Missouri, Eveline and old man and prisoner at witness's, were at dinner that day; when she says twelve o'clock she is governed by a clock and the Georgia Railroad shop bell; those that work out come home at that hour, twelve o'clock, and dinner is always ready; lived on Collins street, on the East side of the Georgia Railroad; Mrs. Thurman and Mrs. Craven were witness's nearest neighbors; it was the forepart of the day prisoner left witness's house; he left for Skull Shoals; don't recollect what he said he was going for; did not state what he was going for; said he was going down there on account of a woman; never saw prisoner any more after he left for Skull Shoals until now in the court house.

Counsel for defence next introduced *Savannah Cobb*, who,

being duly sworn testified as follows: Says she is a sister of the prisoner; he left her father's house on the 9th of April last; the day before that at dinner, mother, father, sister, brother, and self and prisoner; twelve o'clock generally is the dinner hour; are controlled by a time piece and the Georgia Railroad bell; has not seen her brother since he left on Friday morning till now; heard him say he was going to Skull Shoals; the inducement to go was on account of a letter he received from a woman; he received the letter on the 8th of April last, and started the next morning; does not recollect the hour; those that work come in about twelve o'clock, and they have dinner about that time; controlled by a clock and a bell.

Counsel for defendant next introduced *S. B. Love,* who being duly sworn, testified as follows: He is the Sheriff of Fulton county; was at the last Term of the Court; Crockett, Jones and Cobb, were not in the court-house during last Court together; all of them were in the court-house, but thinks on different days.

Counsel for defence next introduced *Elkannah Dean,* who, being duly sworn, testified as follows: He lives in Newton county, near Jasper Jones, about six miles from him; he is a brother of Thomas Jones; Gabriel Jones was under an engagement to be at witness's house on the 1st to the 15th of April, 1858; witness hired him for four months; the contract was made the last of March, of the present year; is second cousin to prisoner and to Gabe Jones.

*Cross-Examined.*—John Cobb, Jr., was not under any obligations to be at witness's house at the first of April last; knows where Skull Shoals are; would go on by Covington to go there; Jasper Jones lives some 8 or 9 miles from Conyers' Station; there is a fork in the road at Conyer's, near Dr. Steward's; Jasper Jones's house is not on the most direct route from here to Skull Shoals.

Counsel for defence next introduced *Duke H. Brannon,* who being duly sworn, testified as follows: He arrested

Jones and Cobb on Monday evening, after Landrum was reported killed; arrested him at the crossing this side of the depot at Decatur, near Mr. Wilson's; Jones and Cobb were coming this way, towards Atlanta.

*Cross-Examined.*—John Cobb looked very bad when witness arrested him; he looked like a dead man; his countenance changed when we arrested him; his countenance changed; he looked very much alarmed; when witness first saw them they were coming out of a woods pasture; witness concealed himself when he saw them; they were near the crossing when arrested; when witness first saw them they were about half a mile off; there was no person with them; they were coming by themselves; it may be half a mile from depot at Decatur, to where they arrested them, or more or less.

Counsel for defence next introduced *Anderson Powell Rice*, who, being duly sworn, testified as follows: Was in jail last April; Mr. Carter, Mr. Jones, Mr. Cobb and Mr. Calloway; does not recollect the day Jones and Cobb were put in; all were together in the same cage; did not hear any conversation between Jones, Cobb and Calloway, in regard to turning State's evidence; heard nothing about the death of Landrum; did not hear anything in reference to a slungshot; did not hear anything about Jones and Cobb having left with Crockett; Mr. Calloway was put in jail with witness; don't know how long they were in before Jones and Cobb; Calloway and witness went in together and came out together.

*Cross-Examined.*—Witness was put in jail the second week of Court; staid in there about three days; does not know how long it was after witness was put in until Cobb and Jones were put in; witness did not have any conversation with them, or any others of them about Crockett and Landrum; does not remember any conversation had the night they were put in; did not pay particular attention to all the talk had in jail; Cobb and Jones might have talked,

and he, witness, not heard; never talked about the Landrum killing none at all; no talk in jail about nothing of that kind; it was in the month of April, 2d week of Court, as well as witness recollects; never heard any thing of the Landrum killing until he came out jail; never knew what Cobb and Jones were put in for; don't know that he did hear all that was talked about in jail; knows Jacob Carter, was in jail with him, in same cell; did not hear Calloway advise Cobb and Jones to confess the night after they came in; on Sunday, before witness was put in jail, was at home, 4 miles from town; was not in town any the week before he was put in; he, witness, staid about the Court-house nearly all day the day he was put in jail; there was quite a crowd around the court-house that day; did not hear anything the day he was about the court-house, about the killing of Landrum, or any other man; was put in jail on Monday; came out on Wednesday or Thursday; bailiff found witness at his father's to-day; nothing said to witness by Cobb and Jones about confessing; could not swear they did not say something about it to Calloway; the cage is about 8 feet wide. The defence here closed.

On closing the examination of each of the following named witnesses, James Hill, Josiah Gammon, Lawrence Hutchings, and Willis F. Westmoreland, and at the close of the direct examination of Silas B. Kent, and before said witnesses respectively left the stand, the Court, at the request of the Solicitor General, and against the objection of defendant, permitted the notes of their evidence which, had been taken down by an amanuensis, appointed by the Court but not sworn, which notes the presiding Judge himself had never read, to be read over to said witnesses respectively, (his own evidence to each witness,) in the presence and hearing of the jury, for the purpose of having the witnesses to say whether their evidence was taken down correctly or not, and having them to point out any alteration or addition that might be requisite to make the said notes conform to the evi-

Cobb vs. The State.

dence as actually delivered.   And the Court, in each instance, allowed the witness to assent, in presence of the jury, to the correctness of the notes as they were read to him, either by his silence, or by a general "yes," or if he (the witness) thought them incorrect, to have them altered or added to, till he (the witness) could endorse them.   To all which reading, assenting to, and altering said notes, in the presence and hearing of the jury, the defendant objected in every instance as soon as the reading was proposed, and the Court, in every case, overruled the objection.   And to which several decisions of the Court overruling said objection and permitting said notes to be read, assented to as correct, or altered, the defendant excepts, and assigns the same for error.

When the slung-shot was exhibited to Willis F. Westmoreland, as stated in the foregoing notes of his evidence, and the witness was asked if he thought such wounds as some of those he had described, could be caused by such an instrument ; defendant objected to his expressing any opinion on that point to the jury.   The Court overruled the objection and permitted the witness to give his opinion as evidence; to which decision of the Court the defendant excepts, and assigns the same for error.

During the examination of Thomas Calloway, by the Solicitor General, he was asked whether if he were to see the slung-shot, described to him by Cobb, he thought he would recognize it from the description ?   He said he would.   The slung-shot, in Court, was then shown to him.   Defendant objected to his stating whether or not this was the one Cobb described.   The Court overruled the objection, and permitted the witness to state that he recognized it from the description given by Cobb; and to this decision of the Court, defendant excepts, and assigns the same for error.

When Eli McConnell was on the stand, and after he had stated all the facts set forth in the foregoing notes of his evidence, down to where he asked Cobb what he had to say in

reply, (the letter referred to by the witness having also been read over to the Court,) defendant moved the Court to exclude any evidence of the reply, on the ground that said reply, if tending to criminate the defendant, was rendered inadmissible by the circumstances under which it was made, and by the improper influences brought to bear on defendant's mind, through the letter and statement of witness as to Crocket's motive in writing, &c. The Court overruled this motion, and permitted the reply to go to the jury as evidence, and to this decision of the Court defendant excepts, and assigns the same for error.

As soon as the reply as testified to by McConnell, came out, defendant moved the Court to withdraw the same from the jury, together with all the previous statements of said witness, on the ground, 1st, that the reply was no confession, but a refusal to confess; 2d, that if a confession or in the nature of a confession, it was not legal evidence for the same reasons before urged against its admission. The Court overruled this motion also; and to this decision of the Court defendant excepts, and assigns the same for error.

When the letter referred to by McConnell, a copy of which is above inserted, was offered in evidence by the State, defendant objected to its being read to the jury; 1st, because there was no proof whose letter it was, or by whom written; 2d, because the contents were illegal testimony, and wholly irrelevant to the issue. The Court overruled the objection, and permitted the letter to be read to the jury, (without any proof, whatever, of its execution,) to which ruling of the Court defendant excepts, and assigns the same for error. The Court admitted the letter for the sole purpose of explaining the import of Cobb's reply to McConnell, and so charged the jury.

Notwithstanding the slung-shot had been offered in evidence, and ruled out, as stated in the notes of the evidence, the Solicitor General, in his concluding argument to the jury, brought it before them, and holding it up in their

presence said, it was a witness in the case, and commented upon it as such, alleging that it proved divers material facts, and especially the fact that Cobb and Crockett were together on the day of the killing.  To this course of the Solicitor the defendant at once objected, and called upon the Court to prohibit it, but the Court declined to interfere, holding that the Solicitor might exhibit the weapon to the jury, it having been frequently exhibited and identified in their presence before, and saying that the calling it a *witness* was a mere matter of taste.  To this ruling and refusal of the Court the defendant excepts, and assigns the same for error.

The Solicitor, after this decision of the Court, persisted in displaying said slung-shot to the jury, and remarking upon it as above.

Arguments having been closed, the Court charged the jury, among other matters, as follows:

GENTLEMEN OF THE JURY:—You have been often reminded, during the progress of this trial, of the importance of the cause committed to you, and I again remind you that it is a case of most momentous importance, both to the State, and to the accused.  To the State, because society is deeply interested in the maintenance of the majesty and dignity of the laws, and the protection of its citizens.  For neither you or I have any security for our lives, our liberty, our reputations, or our property, except in that law which spreads the broad shield of its protection over us, as well in our defenceless slumbers, as while pursuing our daily avocations. To the accused, because, with him, it is a question of life or death, or of liberty or imprisonment.

But important as the issue is, it is to be determined like every other question of fact—by the evidence detailed from the stand; and however momentous the results may be to the State, or to the prisoner, when you have discharged your duty according to your oaths, and your consciences, you are no further responsible for consequences.

You have been cautioned against the influence of popular

prejudice.    After the oaths you have taken, I will not insult
you by presuming the possibility that your verdict can be
influenced either by prejudice on the one hand, or misplaced
sympathy on the other.

Three defendants were jointly accused in this bill of in-
dictment—Radford Crockett, Gabriel Jones and John Cobb,
Jr.   The case of Crocket has been disposed of.   The other
two defendants have severed in their trial, as was their right,
and John Cobb is now alone on his trial, and his guilt or in-
nocence is the only issue to be determined.

The prisoner is charged with the murder of Samuel Lan-
drum, on the 8th day of April, 1858, in the county of Ful-
ton, and upon the State rests the burden of establishing it
by proof.   The law presumes every man innocent, until he
is proven guilty.   It clothes him with a mantle of innocence
which can be stripped off only by proof, and such proof as
convinces the mind beyond a reasonable doubt.

Murder is defined to be the unlawful killing of a human
being in the peace of the State, by a person of sound memory
and discretion, with malice aforethought, either express or
implied.   Express malice is that deliberate intention to take
the life of another which is manifested by external signs
capable of proof, such as lying in wait, previous threats, or
the like.   And malice is implied where no considerable pro-
vocation appears, and where all the circumstances of the
killing show an abandoned and malignant heart.   Where
the homicide is proven to have taken place by violence, the
law presumes malice, unless the circumstances show the
absence of it.

In this case, it is unnecessary to charge you upon the lower
grades of homicide.   There can be no intermediate verdict
between that of guilty of murder, and that of not guilty.   If
the prisoner is not guilty of murder, he is guilty of nothing;
and whether he is guilty or not, it is to be determined by the
evidence—the only way known of arriving at truth in judi-
cial investigation.

Cobb vs. The State.

Evidence is distinguished into two kinds—positive, or direct, and presumptive, or circumstantial. Positive testimony is, when a witness speaks directly from personal knowledge of the principal fact to be proven. Circumstantial evidence is, when the witness does not testify to having witnessed the main fact, but to circumstances *tending* to prove the existence of the main fact. By way of illustration, suppose that, in a charge of murder, a witness swears that he saw the fatal blow inflicted; that would be positive testimony. But in a case when a dead body has been found, with marks of fatal violence upon it, and no witness saw the deed perpetrated, but A. testifies to the fatal character of the wounds; that is one circumstance. Another witness swears to the finding the bloody instrument of death in close proximity to the body; that is another circumstance. A third witness proves that he saw the accused in the immediate neighborhood of the killing, about the time it must have taken place, and a fourth identifies the instrument found, as having been recently in the possession of the accused; this is presumptive, or circumstantial evidence, and affords either a violent or a weak presumption of the truth of the principal fact, to-wit: the guilt of the accused, in proportion to the number of the circumstances—their character—their connection with each other, and their probable relation to the main fact.

It matters not by which of these kinds of testimony a fact is established, provided it is sufficiently convincing in its character to authorize a jury to find the fact true. And, perhaps, the best test of the weight of evidence, whether positive or circumstantial, is the impression it makes upon the minds of reasonable and prudent men. Many kinds of offences can rarely be proven in any other way than by circumstances—such as forgery, arson, and secret assassination, are usually perpetrated in darkness, and with all the precaution of cunning to hide them. Now, one isolated circumstance may afford but very slight indication of guilt,

but, connected with others, it may assume a very grave importance; and one circumstance may explain another. To illustrate this idea: suppose that a human body is discovered with an incised wound in a vital part. Now, if it should be proven that a certain individual was seen close to the scene of the killing, near the time at which it must have taken place, that would be a circumstance indicating that this individual was the slayer; but by itself, it raises too slight a probability to authorize his conviction. But, suppose, further, that a bloody knife were found near the body, with a blade corresponding to the width and depth of the wound, and identified as the property of this individual. Then the first circumstance mentioned, though by itself affording but a slight presumption, when connected with the second, assumes a much graver character; and every additional circumstance, tending to the same point, increases the force of the presumption until it may amount to absolute conviction. But the circumstances, to authorize a conviction in a criminal charge, ought to be such as to satisfy the mind to a reasonable certainty—such as to exclude all other reasonable hypothesis than that of the guilt of the accused; for if you can, taking all the circumstances to be true, reasonably account for the killing of Landrum in any other way than by the agency of the accused, you are bound to do so; but if you believe them to be proven true, and cannot make them consistent with his innocence, you must find him guilty.

The Court having laid down these general principles of law, it is for you to apply them to the facts of this case.

The first inquiry will be, " has a homicide been committed?" "Is Samuel Landrum dead?" " What caused his death?" " Did he die by the act of Providence, by his own hand, or by the hand of violence?" " If he met a violent death, who was the guilty agent?" " Was it the prisoner at the bar?" And in this connection, I lay down another legal proposition: Where two or more persons, acting together

with a common intent and purpose, are present at the commission of a crime, though the deed may be wrought by the hand of one alone, all who are present, aiding, abetting, or giving countenance to it, are alike guilty. The law makes no distinction between them. And if Cobb and Jones and Crockett were all present at the killing of Landrum, acting together with joint purpose and intent, it makes no difference by whose hand the fatal blow was inflicted; they are all equally guilty of murder.

Taking these rules for your guide—and you are judges of the law as well as of the fact—is John Cobb, Jr., guilty, or is he not guilty?

A good deal of argument has been had upon the discrepancy between the witnesses in this case. When an apparent discrepancy exists between the testimony of different witnesses, it is the duty of a jury to reconcile the whole together, if it can be done, so as not to impute perjury to any one. And when witnesses agree as to the important fact testified to, slight discrepancies in the collateral attendant facts, afford no ground to discredit them. For instance, suppose the important fact to be proven is, whether a certain man passed along a certain highway on a given day. Half a dozen witnesses might see him pass, and all differ as to the time of day he passed—the color of his clothes, the persons who preceded or followed him; yet, if they all agreed as to the main fact, there would be no reason to discredit their veracity.

I am requested to charge you upon the subject of positive and negative testimony. It is a rule, that a witness swearing positively to a fact is to be believed in preference to many who swear negatively to the same fact; that is, that *they* did not see it. To give a familiar illustration: If the twelve jurors in that box were in a certain room in which there was a clock, and after coming out, the question should be raised, whether the clock struck a certain hour while they had been there; if three were to swear that they heard it, and the

other nine that they had not heard it, the three must be believed rather than the nine; but, if they had all gone in there, for the purpose of ascertaining whether the clock would strike at a certain hour, and all equally attentive, then the testimony of all would be positive.

The charge of the Court has also been invoked upon the subject of confessions.

The rule of law is, that evidence of confessions is to be received with great caution. This salutary rule is founded on our experience of the infirmity and uncertainty of human memory. A witness testifying to a confession may not have heard it distinctly. The loss of one word may change the import of a whole sentence. The witness, if he hears it distinctly, may not remember it accurately. For these reasons, it would be very unsafe to convict, on a confession alone, uncorroborated by other proof. The same principle applies to a response made by an accused, to the declaration of another. The letter purporting to have been written by Crockett, (and it matters not whether written by him or not,) was admissible, not to prove any fact asserted in it, but for the purpose of ascertaining the import of the response made to it, when read to him, and for no other purpose.

Taking, now, these rules of law, and applying them to the facts of this case, are your minds satisfied, beyond a reasonable doubt, that the prisoner is guilty? If they are, it is your duty—your sworn duty—by your verdict, to find him so. If they are not, it is equally your sworn duty to find him not guilty. By a reasonable doubt, is meant such a doubt as, arising from the evidence, would fasten upon the mind of a reasonable man, and prevent his coming to any settled conclusion. Absolute certainty is not attainable by any mode of human investigation. A reasonable certainty is all, therefore, that it is possible to attain to.

And now, gentlemen, the case is fully committed to your hands, and it remains for you to discharge your part of this

Cobb vs. The State.

important duty, and I doubt not that you will discharge it fearlessly and impartially.

Three defendants were indicted by this bill of indictment, Crockett, Jones and Cobb; Crockett's case has been disposed of and Jones is not on trial. The issue therefore, for you to try is, " is John Cobb, Jr., guilty of the murder of Samuel Landrum," and you have nothing to do with the guilt or innocence of any one else at present; and prisoner by his counsel excepted.

Murder is the killing of a human being in the peace of the State, by a person of sound memory and discretion; with malice aforethought, express or implied—this definition was repeated three times; and prisoner, by his counsel, excepted. The Court then gave the definitions of malice, express and implied, and remarked, where the homicide is proven to have taken place by violence, the law presumes malice, unless the circumstances show the absence of it; and prisoner by his counsel excepted. The Court proceeded, " in this case it is unnecessary to charge you as to the lower grades of homicide; there can be no intermediate verdict between guilty of murder and not guilty. Whether he is guilty or not can be determined by the evidence alone;" and prisoner by his counsel excepted.

The Court, in explaining to the jury the difference between positive and circumstantial evidence, and in telling them what circumstantial evidence was, and what weight ought to be given to it, used this language : " If, in a charge of murder, a witness swears that he saw the fatal blow inflicted, that would be positive evidence. But in a case where a dead body has been found, with marks of violence on it, and no witness saw the deed perpetrated, but A. testifies to the fatal character of the wounds, that is one circumstance. Another witness swears to finding the bloody instrument of death near the body, that is another circumstance. A third witness proves that he saw the accused in the immediate neighborhood of the killing about the time it must have taken place,

and a fourth identifies the instrument as having been recent-ly in the possession of the accused—this is presumptive evidence and affords either a violent or weak presumption of the principal fact, to wit: the guilt of the accused in propor-tion to the number of circumstances, their character, their connection with each other, and their probable relation to the main fact;" and prisoner by his counsel accepted.

The Court said it was immaterial by which of these kinds of evidence a fact is established, provided it is so convincing as to authorize a jury to find the fact true, and perhaps the best test of the weight of evidence, perhaps better than all technical rules, whether the evidence is positive or presump-tive, is the impression it makes upon the minds of reasonable and prudent men ; and prisoner, by his counsel excepted, and excepted to the next sentence of the charge, to wit: many kinds of offences can rarely be proven otherwise than by cir-cumstantial evidence, such as forgery, arson and secret as-sassination, are usually perpetrated in darkness and with all the precaution of cunning to hide them.

The Court said, "the circumstances, to authorize a con-viction on a criminal charge ought to be such as to satisfy the mind to a reasonable certainty, such as to exclude every reasonable hypothesis, other than the guilt of the prisoner. For if you can, taking all the circumstances to be true, rea-sonably account for the killing of Landrum, in any other way than by the agency of the accused, you are bound to do so, but if you believe them proved true and cannot make them consistent with his innocence, you must find him guil-ty; and prisoner by his counsel again excepted.

The Court said, when two or more persons, acting togeth-er with a common interest and purpose, are present at the commission of a crime, though the deed may be done by the hand of one alone, all who are present, aiding or abetting or giving countenance to it, are alike guilty; and prisoner by his counsel excepted.

The Court further said, when an apparent discrepancy ex-

Cobb vs. The State.

ists between the testimony of different witnesses, it is the duty of the jury to reconcile the whole together, if it can be done, so as not to impute perjury to any one. And when witnesses agree as to the important fact testified to, slight discrepancies in the collateral attendant facts, afford no ground to discredit them. For instance, suppose the important fact to be proven is, whether a certain man passed along a certain highway on a certain day, half a dozen witnesses might see him pass, and all differ as to the time of day he passed, the color of his clothes, the persons who preceded or followed him, yet if they all agree as to the main fact, there would be no reason to discredit their veracity—such discrepancies are of no consequence at all; and prisoner by his counsel excepted.

The Court proceeded : I am requested to charge you upon the subject of positive and negative testimony. It is a rule that a witness swearing positively to a fact, is to be believed in preference to many who swear negatively to the same fact—that is, that they did not see it. To give a familiar illustration. If the twelve jurors in that box were in a certain room in which there was a clock, and after coming out, a question should be raised as to whether the clock struck a certain hour while they had been there, if three were to swear that they heard it, and the other nine that they did not hear it, the three must be believed rather than the nine. But if they had all gone there for the purpose of ascertaining whether the clock would strike at a certain hour, and all equally attentive, then the testimony of all would be positive; and prisoner by his counsel again excepted.

The Court then charged the jury, that the evidence of a confession ought to be received with great caution, and that the letter purporting to have been written by Crockett, was admissible, to show the purport of Cobb's reply, and nothing more ; and then closed by saying, taking these rules of law, and applying them to the facts of this case, are your minds satisfied beyond a reasonable doubt, that the prisoner is guil-

ty? If they are, it is your duty—your sworn duty—to find him so. If they are not, it is equally your sworn duty to find him not guilty. By a reasonable doubt, is meant, such a doubt as arising from the evidence, would fasten upon the mind of a reasonable man, and prevent its coming to any settled conclusion. Absolute certainty is unattainable by any mode of human investigation—a reasonable certainty, is all, therefore, that it is possible to attain to; and prisoner by his counsel again excepted.

The jury retired, and returned a verdict of guilty.

Afterwards, upon a day during said Term, a motion for a new trial was made by the defendant, upon the following grounds:

1st. Because the Court erred in permitting the letter signed, R. J. Crockett, to be read to the jury, as evidence.

2d. Because the Court erred in admitting in evidence, the declarations of defendant, made in the penitentiary, as testified to by Eli McConnel.

3d. Because the Court erred in overruling the motion of defendant's counsel, to strike out, and withdraw from the jury, all the evidence of Eli McConnel.

4th. Because the Court erred in charging the jury that " murder is the killing of a human being in the peace of the State, by a person of sound memory and discretion, with malice aforethought, either expressed or implied."

5th. Because the Court erred in saying to the jury, that the evidence justified him in giving them in charge the rule; that when two persons do an act with a common intent, it is immaterial by which the blow was stricken, provided the other is present, aiding, abetting, or giving countenance to the act.

6th. Because the Court erred in charging the jury, that they had nothing to do with the guilt or innocence of any person except the individual on trial.

7th. Because the Court erred in charging the jury, that

Cobb vs. The State.

discrepancies in evidence or between witnesses, were of no consequence, unless they were upon the main fact.

8th. Because the Court erred in instructing the jury, that there was a common sense rule for determining the weight and sufficiency of evidence, better than all technical rules.

9th. Because the Court erred in allowing its notes of the evidence of James Hill, Josiah Gammon, Lawrence Hutchins, Willis Westmoreland and Silas B. Kent, to be read over, in the presence and hearing of the jury, before said witnesses retired from the stand.

10th. Because the Court permitted the Solicitor General, to bring before the jury the "slung-shot," while making the concluding argument, and speak of it as a witness, when it had previously been offered in evidence and ruled out.

11th. Because the verdict of the jury was contrary to evidence, and the decided weight of evidence, and contrary to Law.

12th. Because Peter Ball, was an incompetent juror, having said before he was impanneled, that if he was a juror in said, Cobb's, case, he would stay there until he rotted but that he would find him guilty.

13th. Because Jackson Jett, was an incompetent juror, having made declarations previous to his being impanneled, to the effect, that he would, if on the jury, be certain to find the prisoner guilty.

14th. Because the Court instructed the Sheriff, previous to the trial, to direct the different Constables of the county, to summon tales jurors for said trial, and the said Constables did accordingly summon a large number of the tales jurors who were put upon the prisoner.

The affidavits of Jno. W. C. Evans, in support of the 12th ground, of Wm. Kile, in support of the 13th ground, and the affidavit of Jno. Cobb, Jr., that he was ignorant of the facts sworn to by them, until after verdict, were submitted by the prisoner: (which affidavits charged as set forth in said grounds.)

The affidavit of Peter Ball, denying the charge as to himself, and of Jackson Jett, denying the charge as to himself, and the affidavits of Wm. Markham, James Loyd, W. W. Roak, *et al.*, to the effect, that they were acquainted with the character of said John W. Evans, and would not believe him upon oath in a Court of Justice, were submitted on the part of the State. (And which said affidavits were made a part of this bill of exceptions, and certified by the Clerk to the Supreme Court.) Prisoner by his counsel, proposed to show by witnesses, that Jno. W. Evans, was worthy of belief on oath, and the Court said, if that were done it would leave the oath of Jett against the oath of Evans, and Evans's character still doubtful, and therefore, he would refuse it; and prisoner by his counsel excepted.

—— Jones, made oath in open Court, that William Pucket had informed him, that he heard said Jett say, before said trial, that if he were caught upon the jury, he did not see how he could get around hanging the boys—meaning prisoners; and that said Pucket had been taken violently ill, since said trial; that he had gone to get his affidavit; that Pucket had a spasm, and that the Physician attending on him, said he was not in a proper condition to give an affidavit. One of defendant's counsel stated the same thing as to Pucket's illness and inability to give an affidavit. This was on Monday morning, and the Court postponed the motion, and gave defendant's counsel until the next Monday to procure the affidavit of Pucket.

The Court proceeded on Tuesday morning to hear and determine the motion for a new trial, further time to procure Pucket's evidence not being asked for, and no evidence offered that he was still unwell, and after reading the affidavits on file, and hearing argument, overruled said motion, and refused the new trial; to which refusal defendant excepts, and assigns the same for error.

And now the said defendant on this, the twenty-second day of November, 1858, being within thirty days after the

Cobb vs. The State.

adjournment of said Court, tenders his bill of exceptions, and says the Court erred.

1st. In all the several orders, decisions, rulings, overrulings, and other matters hereinbefore excepted to.

2d. In charging the jury as hereinbefore set forth, and specifically excepted to; and in the whole charge as given to the jury, and in every part thereof.

3d. In refusing a new trial, and in overruling defendant's motion for the same.

4th. In not suspending the decision of said motion for a new trial, for the purpose of giving the defendant an opportunity to procure Pucket's affidavit, and bring forward evidence in support of the credibility of John W. Evans.

And as the facts aforesaid do not appear of record, the said defendant prays that this, his bill of exceptions, may be signed and certified in terms of the law, &c.

CLARK & LAMAR,<br>A. W. HAMMOND & SON,<br>OVERBY & BLECKLEY,<br>Defendant's Attorneys.

CLARK and LAMAR; HAMMOND & SON; and OVERBY & BLECKLEY, for plaintiff in error.

T. L. COOPER, Sol. Gen'l, *contra.*

*By the Court.*—McDONALD J. delivering the opinion.

A new trial was moved for in this case on fourteen grounds. The judgment of the Court refusing the new trial is excepted to, and assigned as error. There are, in the record, several other assignments of error, most of which are made grounds for a new trial, in the motion presented to the Court below, and such as are not and were insisted on before us, we will proceed to consider, after disposing of the points made in

the motion, and not waived by counsel for the prisoner in this Court.

[1.] The fourteenth ground in the motion was the first ground argued before us, in which it is insisted that a new trial should be granted, because the Court instructed the Sheriff, previous to the trial, to direct the different constables of the county to summon tales jurors for said trial, and the said constables did, accordingly, summon a large number of tales jurors, who were put upon the prisoner. This ground, as stated, is not sustained by the record. The Court *advised* the Sheriff to cause the constables to summon a large number of persons residing outside of Atlanta, and in remote parts of the county, to be in attendance at the Court-house, in order that *tales jurors might be summoned with convenience.* None of the persons so summoned, were put upon the defendant as jurors, except such as were taken from the bystanders by the Sheriff, reported to the Court as tales jurors. The case of *Bird vs. The State,* reported in 14 *Geo.,* 51, is a precedent for the course pursued by the presiding Judge in this case, and in fact, goes farther; for the Court, in that case *directed* the Sheriff to cause the persons to be summoned. The reasoning in that case, demonstrates that the practice is convenient to the Court, and beneficial to the person to be tried, by enabling the Sheriff to make up tales jurors from persons less likely to be prejudiced against him. But in this case, there was no objection made to the mode by which the attendance at Court of any of the persons summoned by the Sheriff as tales jurors was procured, and the Court below entertained no doubt that the counsel knew it at the time. This alone is a sufficient reason why a new trial should not be granted on that ground, even if the objection, if made, ought to have been sustained.

[2.] The Court allowed the evidence given by certain of the witnesses, which had been taken down under the eye

of the Court, according to the provisions of the statute, to be read to them, that any error which might have been committed in writing it down might be corrected.

This Court held in the case of *Crawford vs. The State*, 12 *Geo.* 145, that the testimony, for such purposes, might be read over at the instance of either party. It is true that the object of taking down the evidence is not that it may be used on the trial, but it is impossible that the prisoner on trial could have been injured by having it twice impressed on the minds of the jury, if it was taken down correctly, and it could do him no injustice to have errors, if any, corrected. The ruling of the presiding Judge on this point is made the ninth ground in the motion for a new trial.

[3.] The first ground on the motion for a new trial, was an alleged error in the Court in permitting the letter of R. J. Crockett to be read in evidence to the jury, and it is the next of these grounds in the order of discussion in this Court. The letter taken alone and separate and apart from the object with which it was read in evidence was inadmissible. No facts or circumstances stated in the letter could be evidence against the prisoner, for they were the unsworn statements of another person, in the absence of the prisoner, and by which he could not be bound, and in regard to which he had no opportunity to interrogate the writer. The Court in his charge to the jury, explained the purpose for which the letter was admitted in evidence, not to prove any fact asserted in it, but for the purpose of ascertaining the purport of the response made to it when read to the prisoner, and for no other purpose. Again, the presiding Judge said to the jury in his charge, that the evidence of a confession ought to be received with great caution, and that the letter purporting to have been written by Crockett was admissible to show the purport of Cobb's reply, and nothing more. It was impressed on the minds of the jury as strongly as it could be, by the Court, that the letter was not received as evidence against the defendant, and that it could not be so

considered; that they were to look to the letter in connection only, with the reply of the prisoner, and to enable them to understand the import of that reply.

The statements of a wife in the presence of her accused husband may be given in evidence on his trial, although she could not be a witness against him, and her statements could not be evidence. The Court admits it under the general rule, that whatever is said to a prisoner on the subject matter of the charge, to which he makes no answer, or if an answer, no direct answer. That it is the wife who makes the statement does not vary the rule. *Rex. vs. Smithies,* 5 *Car. & Payne,* 332, *King vs. Bartlett,* 7 *Id.* 832. It is the reply, partial reply, or failure to reply, that is to be looked to as evidence, and the statement, whether verbal or written, which induces it, is to be no further considered than it is necessary to understand the reply. With this object the letter was properly admitted, no matter by whom written. 10 *Geo.* 519, 520.

[4.] Then, ought the declarations of the defendant made in the penitentiary, as testified to by Eli McConnell, to have been admitted in evidence, or after having been admitted, ought the evidence of them given in by McConnell, as well as the balance of the evidence of that witness, to have been withdrawn from the jury, as moved by defendant's counsel? The testimony of McConnell is confined to the reception of the letter signed "R. J. Crockett," addressed to the prisoner and Jones, the reading of the letter to Cobb, his short interview with him, and his reply. His reply is what is called his confession. The general rule in regard to confessions, and the same rule applies to this case, is, "that a free and voluntary confession by a person accused of an offence, whether made before his apprehension or after, whether on a judicial examination, or after commitment, whether reduced into writing or not, in short, any voluntary confession, made by a prisoner to any person, at any time or place, is strong evidence against him." 1 *Phillips Ev.* 110

The place in which the reply to the letter was given, and the person (the keeper of the Penitentiary,) to whom it was delivered, if voluntarily made, under no improper influence, constitute no legal objection to its admissibility. There is no evidence of persuasion, or of influence exerted to obtain a confession, which promised temporal profit or advantage to the prisoner. But there is no necessity for discussing this point, for in fact there was no confession.

[5.] The only remaining question to be considered is, whether the reply, which was a refusal to confess, ought to have been allowed to go in evidence to the jury? A homicide on the body of Samuel B. Landrum had been committed. Radford J. Crockett, (the name signed in full to the postscript to the letter) John Cobb, Jr., and Gabriel Jones, stood charged by indictment with his murder. Radford J. Crockett had pleaded guilty. The letter, on the inner side, was addressed to Cobb and Jones; it contains this expression: "Gabe, I think if you will come out and make a full confession of the murder of Landrum, and look to God for mercy, you would be better satisfied." The principal keeper of the penitentiary was requested to read the letter to them, and inform the writer what they said, or whether they seemed to want to talk about it or not. General McConnell complied with the request, and received for answer from the prisoner that he would not confess. The guilt of the defendant must be established, if established at all, by circumstantial evidence, and every circumstance, pointing however slightly to his guilt or innocence, should be submitted to the jury for their consideration. When he was appealed to by one, presumptively from the name, who was indicted with him for the murder, to confess his guilt of the particular crime with the commission of which he stood charged, he simply declared that he would not confess, and made no denial of his guilt. The answer ought to have gone to the jury, to have been allowed by them, whatever weight they might have considered it entitled to, as indicating, however

slightly his guilt. They might have inferred that an inno-cent man would not have contented himself with a simple refusal to confess, but that he would have accompanied it with a positive denial of guilt. It is our judgment, there-fore, that when a defendant jointly indicted for murder, with another who has pleaded guilty to the charge, is appealed to by that other, who must know his guilt, if guilty, to confess the crime, and he simply refuses to confess, but does not deny his guilt, the circumstances may be given in evidence to the jury. They would not alone, perhaps, warrant a con-viction, but they are certainly entitled to some degree of weight, and should be considered.

[6.] The next and last ground insisted upon in the mo-tion for a new trial, before this Court, is that the Court per-mitted the Solicitor General, in his concluding argument, to bring before the jury the slung-shot, and to speak of it as a witness, when it had been previously offered in evidence, and ruled out. It is not very clear, from the record, that the " slung-shot" was ruled out as evidence. When it was objected to as evidence, the Court rejected it as not being such an instrument of evidence as had to *be formally ten-dered and submitted to the jury*, as in the case of a deed or a bond ; and when he came to decide the motion to arrest the argument of the Solicitor General, he held, that that officer might exhibit it to the jury, it having been frequently ex hibited and identified in their presence before, and that to allude to it as a witness was a matter of taste. We see no good reason for excluding it as evidence ; nor do we think that we should control the presiding Judge in a matter of that sort, when he heard the evidence, and was the best Judge if the Solicitor General was in contempt, by disre-garding, before the jury, one of his decisions rejecting evi-dence.

[7.] Thomas Calloway was examined as a witness, to prove that the prisoner had described the slung-shot, and that from his description of it he would know it. He testi-

fied that he thought he would recognize it from the prisoner's description of it. The slung-shot was shown to him, when the defendant objected to his stating whether or not it was the one the prisoner had described. We can see no legal objection to the witness's answer. He could not, of course, swear to its absolute identity; if he had done so, his evidence might have been the subject of comment before the jury, in the same manner that the testimony of a witness might be asserted who should choose to swear positively to a fact of which he must have been ignorant. But there is no reason why a witness should not give evidence that a particular article which he had heard described, corresponded with the description given.

[8.] The rule laid down by the Court below, in his charge to the jury, on the subject of positive and negative witnesses, is objected to, and error is assigned thereon. The Court said to the jury, that a witness swearing positively to a fact, is to be believed, in preference to many who swear negatively, that they did not see it. The objection is, that the charge applies to the credit of the witnesses personally, rather than to the evidence given by them. This is an exception founded more in a verbal criticism, than in a fault in principle; for if the existence of a fact sworn to positively by one witness, is to be believed, rather than its non-existence, because many witnesses who gave no attention, but were in a situation to observe it, testify that they did not see it, or know that it transpired, which is indisputably the legal principle, what is the difference? Are not the jury bound to regard the testimony given by the witness who swore positively, and disregard that given by the witness who swore negatively?

We perceive no error in the charge of the Court, in laying down the rule for reconciling conflicting evidence.

We have now gone through the entire case, as insisted on in the argument before us. Many of the grounds in the motion for a new trial were not urged in this Court, for the reason that the presiding Judge refused to certify to the facts

stated in the *rule nisi*, and perhaps for the additional reason that counsel for plaintiff in error concluded that they could not be sustained in law. It was rather conceded, that if the points herein decided, were ruled against the plaintiff in error, the evidence was sufficient to sustain the verdict of the jury. We deem it unnecessary, therefore, to go into an examination of it, and we content ourselves with the remark that we are satisfied with the correctness of the verdict upon the evidence submitted.

Judgment affirmed.